UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-CR-80140-Marra

UNITED STATES OF AMERICA

v.

ANTHONY CARBONE,

    Defendant.

# PLEA AGREEMENT

The United States Attorney's Office for the Southern District of Florida ("this Office") and Anthony Carbone ("the defendant") enter into the following agreement:

1.    The defendant agrees to plead guilty to counts 2 and 14 of the indictment. Count 2 charges the defendant with conspiracy to traffic in counterfeit drugs, in violation of Title 18, United States Code, Section 2320(a) and (b)(3). Count 14 charges the defendant with distribution of schedule III and IV controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), and (b)(2).

2.    This Office agrees to seek dismissal of the remaining counts of the indictment, as to this defendant, after sentencing.

3.    The defendant is aware that the sentence will be imposed by the Court after considering the advisory Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"). The defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a pre-sentence investigation by

the Court's probation office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose a sentence within that advisory range; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory range. Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

4. The defendant also understands and acknowledges that:

a. On Count 2, the Court may impose a statutory maximum term of imprisonment of twenty years, followed by a term of supervised release of up to five years. In addition to a term of imprisonment and supervised release, the Court may impose a fine of up to $5 million.

b. On Count 14, the Court may impose a statutory maximum term of imprisonment of ten years, followed by a term of supervised release of up to three years. In addition to a term of imprisonment and supervised release, the Court may impose a fine of up to $250,000.

5. The defendant further understands and acknowledges that, in addition to any sentence imposed under the previous paragraph of this agreement, a special assessment in the amount of $200 will be imposed on the defendant. The defendant agrees that any special assessment imposed shall be paid at the time of sentencing. If a defendant is financially unable to pay the special assessment, the defendant agrees to present evidence to this Office and the Court at the time of sentencing as to the reasons for the defendant's failure to pay.

6. This Office reserves the right to inform the Court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

7. The United States agrees that it will recommend at sentencing that the Court reduce by two levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1 of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. If at the time of sentencing the defendant's offense level is determined to be 16 or greater, the government will move for an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines. However, the United States will not be required to comply with this paragraph if the defendant: (1) fails or refuses to make full, accurate, and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the government prior to entering this plea agreement; or (3) commits any misconduct

3

after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

8. This Office and the defendant agree that, although not binding on the probation office or the Court, they will jointly recommend that the Court make the following findings and conclusions as to the sentence to be imposed:

    a. Count 2

        i. *Base Offense Level*: The defendant's base offense level is 8, pursuant to Section 2B5.3(a) of the Sentencing Guidelines.

        ii. *Infringement Amount*: The defendant's offense involved 8050 counterfeit 2 mg Xanax tablets. The average wholesale price of such tablets was $6.82. Therefore, the infringement amount was more than $30,000 but not more than $70,000. Based on that infringement amount, the defendant's offense level should be increased by 6 pursuant to Section 2B5.3(b)(1) of the Sentencing Guidelines.

        iii. *Counterfeit Drug*: Because the offense involved a counterfeit drug, the defendant's offense level should be increased by 2 pursuant to Section 2B5.3(b)(5) of the Sentencing Guidelines.

        iv. *Role in the Offense*: The defendant should not receive an adjustment for his role in the offense, pursuant to Part 3B of the Sentencing Guidelines.

        v. *Adjusted Offense Level*: The defendant's adjusted offense level on count 2 (before adjustment for acceptance of responsibility) is 16.

      b.      Count 14

           i.      *MDPV:* The defendant's offense involved 10 MDPV tablets. Pursuant to Section 2D1.1, Application Note 11 of the Sentencing Guidelines, the total weight of the tablets is presumed to be 2.5 g. Pursuant to Section 2D1.1, Application Note 3 of the Sentencing Guidelines, the role of these tablets in the calculation of the defendant's base offense level should be determined using the marijuana equivalency of MDMA. Therefore, the MDPV tablets are equivalent to 1,250 g of marijuana.

           ii.      *Cocaine*: The defendant's offense involved one kilogram of cocaine, which is equivalent to 200,000 g of marijuana.

           iii.      *Steroids*: The defendant's offense involved 5200 ml of Schedule III controlled substances, which is equivalent to 10,400 g of marijuana.

           iv.      *Alprazolam:* The defendant's offense involved 8050 Alprazolam tablets, which are equivalent to 503 g of marijuana.

           v.      *Base offense level*: Because the marijuana equivalent of the controlled substances involved in the defendant's offense is 211 kg, the defendant's base offense level should be determined pursuant to Section 2D1.1(a)(5) and (c)(7) of the Sentencing Guidelines. If the defendant is sentenced before November 1, 2014, his base offense level will be 26. If the defendant is sentenced after November 1, 2014, and Amendment 782 to the Sentencing Guidelines has taken effect, his base offense level will be 24.

           vi.      *Safety Valve*: Pursuant to Sections 2D1.1(b)(16) and 5C1.2 of the Sentencing Guidelines, the defendant's offense level should be reduced by 2, provided that the defendant is not found to have more than one criminal history point, as determined under the

Sentencing Guidelines and that, not later than the time of the sentencing hearing, the defendant provides to this Office a written statement truthfully setting forth all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan as charged in the indictment.

    vii. *Role in the Offense*: The defendant should not receive an adjustment for his role in the offense, pursuant to Part 3B of the Sentencing Guidelines.

    viii. *Adjusted Offense Level*: Assuming the defendant is sentenced pursuant to Amendment 782 and receives a safety-valve reduction in his offense level, his adjusted offense level on count 14 (before adjustment for acceptance of responsibility) should be 22.

   c. *Combined Offense Level*: For purposes of section 3D1.2 of the Sentencing Guidelines, Counts 2 and 14 are not closely related. For purposes of section 3D1.4 of the Sentencing Guidelines, count 14 is assigned one unit. Assuming the defendant's adjusted offense level on count 14 is 22, his adjusted offense level on count 2 will be between 5 and 8 levels less serious than his adjusted offense level on count 14. In that case, count 2 should be assigned half a unit and his combined offense level (before adjustment for acceptance of responsibility) should be 23.

  9. If the defendant is sentenced before November 1, 2014, the government agrees that it will not oppose a downward variance to a sentence consistent with the sentence the Court would impose were Amendment 782 to the Sentencing Guidelines in effect. The defendant agrees that, if the Court grants such a variance, the defendant will not at any time seek a further reduced sentence pursuant to 18 U.S.C. 3582(c) based on the amendment.

10.  Forfeiture

a.  The defendant also agrees to assist this Office in all proceedings, whether administrative or judicial, involving the forfeiture to the United States of all rights, title, and interest, regardless of their nature or form, in all assets, including real and personal property, cash and other monetary instruments, wherever located, which the defendant or others to the defendant's knowledge have accumulated as a result of illegal activities. Such assistance will involve the defendant's agreement to the entry of an order enjoining the transfer or encumbrance of assets that may be identified as being subject to forfeiture, including but not limited to those specific real and personal properties set forth in the forfeiture counts of the indictment. Additionally, defendant agrees to identify as being subject to forfeiture all such assets, and to assist in the transfer of such property to the United States by delivery to this Office upon this Office's request, all necessary and appropriate documentation with respect to said assets, including consents to forfeiture, quit claim deeds and any and all other documents necessary to deliver good and marketable title to said property.

b.  The defendant further agrees to forfeit to the United States voluntarily and immediately all of the defendant's right, title and interest to any and all assets, and/or their substitutes which are subject to forfeiture pursuant to Title 21, United States Code, Section 853 and/or Title 18, United States Code, Sections 2320(c) and 2323.

c.  The assets to be forfeited include a money judgment in the amount of $10,700 in United States currency, which constitutes proceeds obtained as a result of the offenses set forth in counts 2 and 14 of the indictment.

7

   d. The assets to be forfeited include one light blue 1991 Mercedes Benz 560SEL, vehicle identification number WDBCA39E0MA594789, bearing Florida Plate 371-MUM, which was used and intended to be used to facilitate the offense set forth in count 2 of the indictment.

   e. Defendant knowingly and voluntarily agrees to waive any claim or defense the defendant may have under the Eighth Amendment to the United States Constitution, including any claim of excessive fine or penalty with respect to the forfeited asset(s).

  11. The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office, or the Court. The defendant understands further that any recommendation that the government makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. The defendant understands and acknowledges, as previously acknowledged in paragraph 3 above, that the defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by the defendant, the government, or a recommendation made jointly by both the defendant and the government.

12.     This is the entire agreement and understanding between the United States and the defendant. There are no other agreements, promises, representations, or understandings.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 9/19/14                By: _____
                                 MARC OSBORNE
                                 ASSISTANT UNITED STATES ATTORNEY

Date: 9/19/14                    _____
                                 JEFFREY S. WEINER
                              for ATTORNEY FOR DEFENDANT

Date: 9/9/14                     _____
                                 ANTHONY CARBONE
                                 DEFENDANT

9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-CR-80140-Marra

UNITED STATES OF AMERICA

v.

ANTHONY CARBONE,

Defendant.

## FACTUAL PROFFER

The United States Attorney's Office for the Southern District of Florida and the defendant, Anthony Carbone, agree that the following statement of facts is accurate and provides a factual basis for Carbone's plea of guilty:

1. On January 24, 2014, a cooperating source (CS) met with co-defendants Fiore and Jones at Havana Nights Cigar Bar and Lounge, a bar that Fiore was preparing to open in Boca Raton, Palm Beach County, in the Southern District of Florida. They discussed the CS's desire to buy Xanax. Fiore described Jones as the manufacturer of the Xanax. Jones gave the CS 20 apparent Xanax tablets as a sample.

2. On February 11, 2014, the CS and an undercover officer (UC1) met Fiore and Jones at Havana Nights. Jones arrived at the bar driving a 1991 Mercedes Benz 560SEL, vehicle identification number WDBCA39E0MA594789, bearing Florida Plate 371-MUM. Fiore and Jones offered to sell UC1 2,000 Xanax tablets for $2.00 per tablet and UC1 agreed. Fiore stated

that UC1 should pay the money to Fiore's bank account. Jones called someone to have the tablets delivered. Shortly afterward, Conspirator 1 delivered the tablets to UC1 at Havana Nights.

3. The CS was familiar with Fiore's bank account from previous transactions. On February 19, 2014, the CS wired $4000 to the account, BB&T account ****8933. The account holder was Prestige Group Int. Inc. Fiore was the sole signatory on the account and the sole officer and agent of the corporation.

4. On February 26, 2014, UC1 met Fiore and Jones at Havana Nights and asked to buy 5000 Xanax. Jones called someone to have the tablets delivered. While Jones was on the phone, Fiore acknowledged receiving the $4,000 wire. Shortly after Jones finished his call, Carbone arrived. At Fiore's request, UC1 left Fiore, Jones, and Carbone alone to talk. When UC1 returned, Jones told UC1 that he could only provide 3,000 Xanax. UC1 and Jones agreed to meet back at Havana Nights later that day to complete the sale.

5. UC1 returned to the bar a few hours later, as agreed, and met Jones in the parking lot. Jones removed a Ziploc bag containing 2,000 apparent Xanax tablets from the trunk of the Mercedes described above and gave the bag to UC1. Jones told UC1 that the Xanax would cost $1.75 per pill.

6. On March 6, 2014, the CS wired $3500 to the Prestige Group bank account to pay for the Xanax that Jones gave UC1 on February 26, 2014.

7. On April 17, the CS and a second undercover officer (UC2) met Fiore at a restaurant near Havana Nights. The restaurant was in Boca Raton, Palm Beach County, in the Southern District of Florida. Fiore had previously told the CS that he would have 2000 Xanax pills

2

to sell UC2. However, at the restaurant Fiore told the CS and UC2 that he did not have the pills. UC2 agreed to buy the pills from Fiore on April 29, 2014 instead. Carbone arrived at the restaurant. Fiore went to another table with Carbone. Fiore held Carbone by the back of the neck and yelled at him. Fiore and Carbone then returned to the table with UC2. Carbone apologized that he did not have the pills ready that day.

8. On April 29, 2014, UC2 met Fiore at Havana Nights. Fiore told UC2 that he had spoken with the "kid" about having a regular supply of pills for UC2. UC2 had previously asked to buy steroids from Fiore. Fiore asked UC2 what types of steroids he wanted to buy and UC2 answered that he wanted Testosterone Enanthate, Propionate and Deca, all of which were schedule III controlled substances. Fiore said he believed the vials would be 10 ml and would cost $25 per vial. Fiore said he would introduce UC2 to the steroid supplier so they could discuss the details.

9. Later that day, April 29, 2014, Fiore called UC2 and asked him to come back to Havana Nights. When UC2 arrived, Conspirator 2 gave UC2 a box. Fiore told UC2 that Fiore had another 5,000 of those. The box was later found to contain 2,000 apparent Xanax tablets.

10. On April 29, 2014, the CS wired $3,000 into the Prestige Group account to pay for the apparent Xanax that Fiore had given UC2 earlier that day.

11. On May 6, 2014, UC2 met Conspirator 3 at Havana Nights and Conspirator 3 gave UC2 a black bag. The bag was subsequently determined to contain 10 vials labeled as Testosterone Propionate, 10 vials labeled as Testosterone Enanthate and 10 vials labeled as Deca-Durabolin Nandrolone Decanoate, all three of which were steroids and schedule III controlled

3

substances. UC2 put the bag in his car, after which Fiore called UC2 and asked UC2 to meet Fiore at a nearby restaurant. The restaurant was in Boca Raton, Palm Beach County, in the Southern District of Florida. UC2 met with Fiore at the restaurant. Fiore told UC2 that the bag contained 10 vials of each of the three steroids UC2 had requested. UC2 counted out $1,200 and gave the money to Fiore. UC2 asked for another 2,000 Xanax pills. Fiore replied that he had 7,500 pills available. Fiore told UC2 that his steroid supplier had not been able to get him the steroids more quickly because there had been a problem with the product labeling. Fiore agreed to sell UC2 Xanax pills for $1.00 per pill if the order totaled 5,000 pills, because Fiore was getting them directly from the supplier. Fiore said there were problems with the pill press breaking pills during the manufacturing process, but that the problem would not affect Fiore's sales to UC2. Laboratory analysis of samples of the vials later determined that the vials labeled as Testosterone Enanthate and "Deca-Durabolin Nandrolone Decanoate contained those steroids. The vials labeled Testosterone Propionate contained a different steroid, Boldenone Undecylenate, which was also a Schedule III controlled substance.

12.   On May 13, 2014, UC2 met Fiore at Havana Nights. Fiore asked for the names of the steroids that UC2 wanted to buy and UC2 texted the same three names to Fiore. Fiore said he would introduce UC2 to the person who supplied his Xanax and steroids and that UC2 should deal directly with the supplier, but that UC2 should come back to Fiore if he needed anything besides Xanax and steroids. Fiore and UC2 then walked to Fiore's car, where Fiore gave UC2 a Goya Rice & Red Beans box, which was later found to contain 2000 apparent Xanax tablets.

13. Later that day, May 13, 2014, UC2 returned to Havana Nights and again met with Fiore, who gave UC2 a bag. The bag was later found to contain a box that in turn contained 30 vials of steroids, labeled the same way as the vials Fiore had sold UC2 on May 6, 2014. Laboratory analysis of samples of the vials later determined that they contained the same steroids as the ones Fiore sold UC2 on May 6, 2014.

14. On May 15, 2014, the CS wired $3,000 into the Prestige Group account to pay for the apparent Xanax that Fiore had given UC2 on May 13, 2014.

15. On June 12, 2014, Fiore sent UC2 a text message to meet his steroid and Xanax supplier the next day, June, 13, 2014, at a restaurant in Boca Raton, Palm Beach County, in the Southern District of Florida.

16. On June, 13, 2014, UC2 met Carbone at the restaurant. UC2 paid Carbone $1200 in cash, after which Carbone drove to his house in Deerfield Beach, Broward County, in the Southern District of Florida. Carbone went into the house briefly, came out carrying a shopping bag, and drove to a Target store in Deerfield Beach, Broward County, in the Southern District of Florida, where he and UC2 had agreed to meet. Carbone gave UC2 the bag, which was later found to contain 30 vials of steroids and 2000 apparent Xanax tablets. According to the labels, the vials contained five different steroids, two of which were themselves blends of multiple steroids. All these steroids were schedule III controlled substances. Laboratory analysis of samples of the vials later determined that they contained the following steroids, all of which were Schedule III controlled substances: Testosterone Propionate, Testosterone Isocaproate, Testosterone Decanoate, Testosterone Phenylpropionate, Trenbolone Acetate, Trenbolone Enanthate,

5

Nandrolone Decanoate, and Boldenone Undecylenate. Some but not all of these steroids were listed on the labels of the vials.

17.  At all times relevant to the offenses charged in the indictment, 'Xanax' was registered as trademark 1,137,561 on the principal register in the United States Patent and Trademark Office and was in use in by Pfizer Inc., the owner of the trademark, in connection with the sale of authentic Xanax.

18.  At all times relevant to the offenses charged in the indictment, Alprazolam was a drug and a schedule IV controlled substance and was the active ingredient in Xanax.

19.  In June 2014, the average wholesale price of a 2 mg tablet of Xanax was $6.82.

20. All the apparent Xanax tablets discussed in this proffer closely resembled authentic 2 mg Xanax tablets. Among other things, the word 'Xanax' was embossed on each tablet. In each case, laboratory analysis of samples of the tablets revealed that the tablets contained Alprazolam. However, the tablets were not manufactured by Pfizer and were not authentic Xanax.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 9/19/14      By: *[signature]*
MARC OSBORNE
ASSISTANT UNITED STATES ATTORNEY

Date: 9/19/14      *[signature]*
JEFFREY S. WEINER
ATTORNEY FOR DEFENDANT

Date: 9/19/14      *[signature]*
ANTHONY CARBONE
DEFENDANT

7